**Randall Cary BOYD, Appellant,**

v.

**Ginger BOYD, Appellee.**

No. 2–00–218–CV.

Court of Appeals of Texas,
Fort Worth.

Jan. 3, 2002.

Richard R. Orsinger, San Antonio, Gary L. Nickelson, Fort Worth, for Appellant.

Paddock & Associates, Michael B. Paddock, Fort Worth, Frank J. Douthitt, Henrietta, Baker Botts LLP and Amy Douthitt Maddux, Houston, for Appellees.

Panel B: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### I. Introduction

In this marital property case, we must decide whether a mediated settlement agreement that complies with section 6.602(b) of the Texas Family Code is enforceable if one party to the agreement intentionally failed to disclose to the other party the existence of significant marital property. We must also decide whether the trial court abused its discretion in making the property division in the parties' divorce decree, particularly with regard to deferred compensation benefits and stock options. Because we hold that the mediated settlement agreement is not enforceable under the circumstances of this case and that the trial court did not abuse its discretion in making the property division, we affirm the trial court's judgment.

### II. Background Facts and Procedural History

Randall Boyd and Ginger M. Boyd were married in 1981. They had one child, a daughter named Ashley. They separated in February 1996, and Ginger filed for divorce that same month. Randall was awarded temporary custody of Ashley, and the parties entered into a mediated settlement agreement (MSA) in May 1997. In August 1997, Ginger rejected the MSA, contending it was void or voidable because Randall had not made a fair and reasonable disclosure of the parties' marital property and financial obligations, even though he had intentionally misrepresented that he had.

Ginger also hired an attorney, Brian Webb, to represent Ashley's interests. On August 20, 1997, Webb filed a petition in intervention on Ashley's behalf. Webb contended that the M.S.A. was void because it designated the parties as joint managing conservators, but did not designate either party as the primary parent or designate a county of residence as required by the family code. Randall objected to Webb's representation of Ashley, but the trial court held that either or both parents could hire counsel to represent Ashley because the temporary orders authorized both parents to represent her in legal actions.

Randall moved to enforce the M.S.A. based on sections 6.602 and 153.0071 of the family code. The trial court held a hearing on Randall's motion in September 1998. In April 1999, the trial court entered an order denying the motion. The court concluded that the M.S.A. was unenforceable and had to be set aside so the court could make a fair and just division of the marital property and enter enforceable orders for the protection and best interest of Ashley. The court found that the M.S.A. did not include substantial community assets, including bonus money earned and not disclosed by Randall, and did not properly address visitation and access to Ashley.

Thereafter, the case proceeded to trial in October 1999. Before the property issues were tried, the parties reached an agreement on the issues relating to Ashley. After a trial on the property issues, the trial court signed a divorce decree. The decree states that Randall and Ginger "are divorced as of December 13, 1999." The decree incorporates the parties' settlement provisions regarding Ashley and divides the marital estate. This appeal followed.

In fourteen issues on appeal, Randall complains that the trial court erred in ruling that the M.S.A. was unenforceable

and abused its discretion in making the property division in the divorce decree.

## III. Mediated Settlement Agreement

### A. Statutory Construction of Section 6.602(c)

Texas has a public policy of encouraging the peaceful resolution of disputes, particularly those involving the parent-child relationship, and the early settlement of pending litigation through voluntary settlement procedures. TEX. CIV. PRAC. & REM.CODE ANN. § 154.002 (Vernon 1997). Trial and appellate courts are charged with the responsibility of carrying out this public policy. *Id.* § 152.003 (Vernon Supp.2002); *Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 715 (Tex.App.-Houston [1st Dist.] 1988, writ denied) (op. on reh'g). The Texas Family Code also furthers this policy by providing that a mediated settlement agreement is binding on the parties if the agreement:

 (1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;

 (2) is signed by each party to the agreement; and

 (3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

TEX. FAM.CODE ANN. §§ 6.602(b), 153.0071(d) (Vernon Supp.2002). Mediated settlement agreements are binding in suits affecting the parent-child relationship, as well as suits involving only marital property. TEX. FAM.CODE ANN. §§ 6.602(b)-(c), 153 .0071(d)-(e); *Spinks v. Spinks,* 939 S.W.2d 229, 230 (Tex.App.-Houston [1st Dist.] 1997, no writ). Because we are not required to construe section 153.0071 to dispose of this appeal, we limit our discussion to section 6.602. However, we note that the wording of sections 6.602(b)-(c) and 153.0071(d)-(e) is identical. TEX. FAM. CODE ANN. §§ 6.602(b)-(c), 153.0071(d)-(e).

■ Ordinarily, settlement agreements arising from mediation are not binding where one party withdraws consent to the agreement, unless the other party successfully sues to enforce the settlement agreement as a contract that complies with rule 11 of the Texas Rules of Civil Procedure. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 154.071(a) (Vernon 1997) (providing that settlement agreements arising from mediation are enforceable in the same manner as any other written contract); *Padilla v. LaFrance,* 907 S.W.2d 454, 461–62 (Tex. 1995) (holding that, once consent to settlement agreement is withdrawn, agreement can only be enforced as a binding contract that complies with rule 11, as established by proper pleading and proof); *Alcantar v. Okl. Nat'l Bank,* 47 S.W.3d 815, 819 (Tex. App.-Fort Worth 2001, no pet.) (same).

■ Unilateral withdrawal of consent does not, however, negate the enforceability of a mediated settlement agreement in a divorce proceeding, and a separate suit for enforcement of a contract is not necessary. *Alvarez v. Reiser,* 958 S.W.2d 232, 234 (Tex.App.-Eastland 1997, writ denied). Rather, section 6.602 creates a procedural short cut for the enforcement of mediated settlement agreements in divorce cases. *Cayan v. Cayan,* 38 S.W.3d 161, 166 (Tex. App.-Houston [14th Dist.] 2000, pet. denied). Thus, a mediated settlement agreement that meets the requirements of section 6.602(b) is binding, and a party is entitled to judgment on the agreement notwithstanding rule 11 or another rule of law. TEX. FAM.CODE ANN. § 6.602(c); *see also id.* § 153.0071(e); *Alvarez,* 958 S.W.2d at 234.

In his first issue, Randall contends that the "notwithstanding rule 11 or another rule of law" language in the statute means

that a mediated settlement agreement that complies with section 6.602(b) is not subject to [trial court] review and that a trial court's failure to enforce the agreement is reversible error. We decline to construe section 6.602(c) in such a restrictive manner.

■ In construing a statute, our objective is to determine and give effect to the legislature's intent. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000). When terms are not defined in a statute, we apply their ordinary meaning. TEX. GOV'T CODE ANN. §§ 311.011, 312.002(a) (Vernon 1998); *Nat'l Liab. & Fire Ins. Co.*, 15 S.W.3d at 527. We also presume that the legislature intended a just and reasonable result in enacting a statute. TEX. GOV'T CODE ANN. § 311.021(3). A court will not construe a statute in a manner that will lead to a foolish or absurd result when another alternative is available. *Del Indus., Inc. v. Tex. Workers' Comp. Ins. Fund*, 973 S.W.2d 743, 747–48 (Tex.App.-Austin 1998), *aff'd*, 35 S.W.3d 591 (Tex.2000).

Construing the phrase "notwithstanding rule 11 or another rule of law" to mean that a mediated settlement agreement that complies with section 6.602(b) must be enforced no matter what the circumstances could require enforcement of an agreement that was illegal or that was procured by fraud, duress, coercion, or other dishonest means. We do not believe that the legislature intended such an absurd result in enacting section 6.602. Rather, we construe this phrase to mean that the requirements of rule 11 and the common law that ordinarily apply to the enforcement of settlement agreements do not apply to mediated settlement agreements in divorce proceedings, if the agreements meet the three requirements listed in section 6.602(b). *See Cayan*, 38 S.W.3d at 166 (stating that section 6.602 was enacted to create a pro-

cedural short cut for the enforcement of mediated settlement agreements in divorce cases).

■ We hold that the phrase "notwithstanding rule 11 or another rule of law" does not require a trial court to enforce a mediated settlement agreement simply because it complies with section 6.602(b), irrespective of what the agreement provides for or how it was procured. *See In re Kasschau*, 11 S.W.3d 305, 311 (Tex.App.-Houston [14th Dist.] 1999, orig. proceeding) (op. on reh'g) (holding that trial court did not err by refusing to enforce mediated settlement agreement that contained an illegal provision); *see also Cayan*, 38 S.W.3d at 166 n. 8. We overrule the portion of Randall's point first in which he contends that a mediated settlement agreement that complies with section 6.602(b) is not subject to review.

## B. Enforceability of the MSA

In this case, Ginger contended that the M.S.A. was void or voidable because Randall committed fraud when he did not make a fair and reasonable disclosure of all of the marital property known to him, but intentionally misrepresented that he had. The court found that the M.S.A. "did not include substantial community assets, including bonus money earned and not disclosed" by Randall and concluded that the M.S.A. was unenforceable. However, because Randall had not filed a false answer to formal discovery, which was not yet due at the time of mediation, the trial court refused to find that Randall had committed fraud. The court also refused to find that Ginger would not have signed the M.S.A. absent Randall's failure to disclose the substantial community assets, but the court's order recites that the failure to disclose "might have affected the allocation decisions made by [Ginger]."

In his first, second, and third issues, Randall contends that the trial court erred in concluding that the M.S.A. was unenforceable because it did not include substantial undisclosed community assets. In his fourth issue, Randall questions whether a spouse in a divorce proceeding has a duty to disclose to the other spouse the existence of assets except through formal discovery.

### 1. Standard of Review

We review a trial court's conclusions of law de novo as legal questions. *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 503 (Tex.App.-Waco 1997, pet. denied). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *State Bar v. Leighton*, 956 S.W.2d 667, 671 (Tex.App.-San Antonio 1997) (op. on reh'g), *pet. denied per curiam*, 964 S.W.2d 944 (Tex.1998). Incorrect conclusions do not require a reversal if the controlling findings of fact will support a correct legal theory. *Hitzelberger*, 948 S.W.2d at 503.

### 2. Discussion

Randall's receipt of a $60,000 bonus in 1996 was disclosed at mediation. He does not deny that he failed to disclose an additional $230,000 bonus—also earned during 1996—at the mediation, nor does he challenge the trial court's finding that the undisclosed bonus was community property. To the contrary, Randall testified as follows regarding the bonus:

[Q] If someone had asked you during the time of that mediation what your incentive pay for that pay that you had earned for 1996 was, would you know what that amount of dollars would have been?

[A] Yes, I could have. I had been paid the sixty and I knew the two thirty was coming. I just didn't know when, so—

. . . .

[Q] You knew that at the time of mediation?

[A] Right.

[Q] And you knew the specific dollar amount at the time of the mediation?

[A] Yeah. I was pretty clear on the dollar amount, yes.

Despite this admission, Randall contends that the trial court erroneously concluded that the M.S.A. was unenforceable because written pretrial discovery was not due by the time of mediation, Ginger was represented at mediation by two lawyers, and the trial court refused to find that he had committed fraud. He also asserts that the assets he failed to disclose are covered by the MSA's catchall provision that "[a]ny undisclosed property is specifically awarded in equal shares to the parties." But Randall does not direct us to any evidence that he ever intended for Ginger to know about the assets he failed to disclose. Indeed, the catchall provision that Randall relies on is immediately preceded by the statement that "[i]t is the intention of the parties to divide only the property as it is specifically set out on Husband's inventory or otherwise referred to herein." Further, the M.S.A. contains a full disclosure provision: "Each party represents that they have made a fair and reasonable disclosure to the other of the property and financial obligations known to them." These provisions show that the parties intended to divide all of their marital property via the M.S.A. only after a full disclosure of what that property consisted of.

Where a person is under a duty to disclose material information, refrains from doing so, and thereby leads another to contract in reliance on a mistak-

en understanding of the facts, the resulting contract is subject to rescission due to the intentional nondisclosure. *See Smith v. Nat'l Resort Communities, Inc.,* 585 S.W.2d 655, 658 (Tex.1979) (holding that purchaser could rescind contract where seller failed to disclose a fact—the flooding of the subject real estate—that seller knew purchaser would regard as material). A duty to speak arises from a fiduciary or confidential relationship or where a person is, "by force of circumstances," under a duty to speak. *A.R. Clark Inv. Co. v. Green,* 375 S.W.2d 425, 435 (Tex.1964); *Casa El Sol–Acapulco v. Fontenot,* 919 S.W.2d 709, 718 (Tex.App.—Houston [14th Dist.] 1996, writ dism'd by agrmt.). The fiduciary duty arising from the marriage relationship does not continue when a husband and wife each hire independent professional counsel to represent them in a contested divorce proceeding. *Parker v. Parker,* 897 S.W.2d 918, 924 (Tex.App.-Fort Worth 1995, writ denied). Nonetheless, we believe that a duty to speak exists where, as here, the parties to a mediated settlement agreement have represented to one another that they have each disclosed the marital property known to them. "[W]hen one voluntarily discloses information, he has a duty to disclose the whole truth rather than making a partial disclosure that conveys a false impression." *World Help v. Leisure Lifestyles, Inc.,* 977 S.W.2d 662, 670 (Tex.App.-Fort Worth 1998, pet. denied).

Ginger asserted in the trial court that Randall did not make a fair and reasonable disclosure of the property known to him, and the trial court found that the M.S.A. did not include substantial community assets, including bonus money earned and not disclosed. The trial court also found that the failure to disclose the bonus money might have affected Ginger's allocation decisions regarding the MSA. These findings support the trial court's conclusion that the M.S.A. is unenforceable.

Further, we hold that inserting a catchall provision into a mediated settlement agreement while at the same time intentionally withholding information about substantial marital assets will not save the mediated settlement agreement from being held unenforceable. To conclude that such a provision operated to render a mediated settlement agreement enforceable in this situation would encourage gamesmanship, not the peaceable resolution of disputes favored by Texas public policy.[1] *See* Tex. Civ. Prac. & Rem.Code Ann. § 154.002.

Randall cites several cases in which mediated settlement agreements were enforced; however, none of those cases involved a situation in which one spouse had intentionally withheld information about substantial marital assets. *See Cayan,* 38 S.W.3d at 166–67 & n. 8; *Alvarez,* 958 S.W.2d at 234; *In re Marriage of Ames,* 860 S.W.2d 590, 591–92 (Tex.App.-Amarillo 1993, no writ) (op. on reh'g); *In re Marriage of Banks,* 887 S.W.2d 160, 163 (Tex. App.-Texarkana 1994, no writ).

Because the trial court's legal conclusion that the M.S.A. was unenforceable is proper, we overrule Randall's first through fourth issues. Also, in light of our holding regarding these issues and the parties' agreement regarding the issues concerning Ashley, we need not consider Randall's fifth, sixth, and seventh issues, in which he

1. We do not hold that a catchall provision cannot be used in a mediated settlement agreement to divide marital property that was inadvertently omitted from the parties' disclosures. That situation is not before us, and we do not address it. We also do not decide whether a mediated settlement agreement can be set aside on grounds other than the intentional failure to disclose substantial marital assets.

complains of the trial court's other legal conclusions about why the M.S.A. had to be set aside.

## IV. Property Division

In points eight through fourteen, Randall complains about the property division in the divorce decree.

### A. Standard of Review

 A trial court has broad discretion in dividing the marital estate in a manner that the court deems just and right. *See* TEX. FAM.CODE ANN. § 7.001 (Vernon 1998); *Murff v. Murff,* 615 S.W.2d 696, 698 (Tex.1981); *Smith v. Smith,* 22 S.W.3d 140, 143 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (op. on reh'g). We will not disturb a trial court's property division unless the trial court clearly abuses that discretion. *Bell v. Bell,* 513 S.W.2d 20, 22 (Tex.1974); *Smith,* 22 S.W.3d at 143. Only community property is subject to the trial court's just and right division, however. *Osborn v. Osborn,* 961 S.W.2d 408, 413–14 (Tex.App.-Houston [1st Dist.] 1997, pet. denied). The trial court has no discretion to divest a spouse of his separate property. *Cameron v. Cameron,* 641 S.W.2d 210, 220 (Tex.1982); *Osborn,* 961 S.W.2d at 414.

### B. Retirement Benefits

In his eighth point, Randall contends that the trial court erroneously awarded Ginger a one-half interest in the portion of his four defined benefit plans and his 401(k) plan that will arise by virtue of his future employment because deferred compensation benefits related to post-divorce employment are the separate property of the spouse who earns them.

The divorce decree awards Ginger:

One-half (50%) of all sums, whether matured or unmatured, accrued or unaccrued, vested or otherwise, together with all increases thereof, the proceeds therefrom, and any other rights related to any each [sic] of the following retirement accounts, ... deferred compensation plans, or other benefits existing by reason of the husband's past, present, or *future employment,* ... including but not limited to:

A. Sky Chefs 401(k) Plan.

B. Onex Food Services Executive Deferred Compensation Plan.

C. Onex Food Services Defined Benefit Retirement Plan.[2]

D. Sky Chefs Supplemental Executive Retirement Plan.

E. IBM Defined Benefit Retirement Plan in the name of Randall C. Boyd. [Emphasis added.]

Community property consists of the property, other than separate property, acquired by either spouse during marriage. TEX. FAM.CODE ANN. § 3.002 (Vernon 1998); *Douglas v. Delp,* 987 S.W.2d 879, 882 (Tex.1999). Randall acknowledges that deferred compensation plans such as defined benefit plans[3] and defined contribution plans[4] are community proper-

---

2. Although the divorce decree refers to this plan as an Onex Food Services Plan, it seems to be referred to in the evidence as the Sky Chefs Defined Benefit Retirement Plan. Also, Onex acquired Sky Chefs in 1986 and is a holding company for Sky Chefs. Accordingly, we will treat these two names as referring to the same plan.

3. A defined benefit plan promises employees a monthly benefit beginning at retirement, based on plan-specific factors such as the number of years of service, age, and salary history. *Smith,* 22 S.W.3d at 148; *Baw v. Baw,* 949 S.W.2d 764, 768 n. 3 (Tex.App.-Dallas 1997, no writ).

4. A defined contribution plan is one in which the employer and/or employee make contribu-

ty to the extent they are attributable to employment during the marriage. *See* Joseph W. McKnight, *Family Law: Husband and Wife, Annual Survey of Texas Law,* 50 SMU L.REV. 1189, 1201–02 (1997). He does not assert that plans A through E consisted of property other than community property on the date of divorce. Indeed, although he asked the trial court to award the 401(k) plan to him, he asked the court to divide plans B through E equally between Ginger and him. But Randall complains that, by insertion of the words "future employment" into the property division for Ginger, the trial court improperly awarded her 50% of the benefits from the above plans that will arise because of his post-divorce employment. Randall contends that retirement benefits that had not vested or had not been earned at the time of the divorce were not community property and that Ginger should not have received 50% of those benefits.

### 1. Defined Benefit Plans

■ An employee spouse's accrued benefits in a defined benefit retirement

plan that have been earned during marriage, but have not vested and matured at the time of divorce, are a contingent property interest and a community asset subject to division upon divorce. *Cearley v. Cearley,* 544 S.W.2d 661, 665–66 (Tex. 1976); *Burchfield v. Finch,* 968 S.W.2d 422, 423 (Tex.App.-Texarkana 1998, pet. denied); *May v. May,* 716 S.W.2d 705, 707 (Tex.App.-Corpus Christi 1986, no writ). The community property interest in the benefits is calculated differently for defined benefit plans than for defined contribution plans. The three factors in the formula for determining the nonemployee spouse's share of a defined benefit plan are the community share, the community extent, and the value of the retirement benefit. *See* Steven R. Brown, *An Interdisciplinary Analysis of the Division of Pension Benefits in Divorce and Post–Judgment Partition Actions: Cures for the Inequities in Berry,* 37 BAYLOR L.REV. 107, 136–37 (1985). In equation form, these factors become:

$$\frac{1}{2} \times \frac{\text{\# of months married under plan}}{\text{\# of months employed under plan at date of divorce}} \times \text{value of plan at date of divorce} = \text{nonemployee spouse's share}$$

(community share)[5] (community extent) (value)

*Id.; Berry v. Berry,* 647 S.W.2d 945, 946–47 (Tex.1983) (adopting formula for calculating *value* of community property interest upon divorce, based on *Taggart*[6] formula); *Phillips v. Parrish,* 814 S.W.2d 501, 504 (Tex.App.-Houston [1st Dist.] 1991,

writ denied) (applying *Berry* formula); *May,* 716 S.W.2d at 707 (same).

In this case, it is undisputed that all of the property in the defined benefit plans (plans B–E) at the time of the divorce had accrued while the parties were married. Further, Ginger accepted as correct

---

tions to an individual account set up for the employee. *Baw,* 949 S.W.2d at 768 n. 2.

**5.** The community share of retirement benefits is often one-half because an equal (one-half) division of all community assets, including pension interests, is presumed in divorce actions. But this presumption is subject to the

trial court's broad discretionary powers concerning the division of community property. *See id.*

**6.** *Taggart v. Taggart,* 552 S.W.2d 422, 424 (Tex.1977) (setting out formula for determining *extent* of community interest in retirement benefits upon divorce).

Randall's valuation of the plans. Thus, we need not recalculate the value of the community extent in the plans as of the date of divorce.[7] Further, Randall's complaint is not about the 50–50 division of the plan values through the date of divorce, but about the trial court's award of 50% of any *future* increases in value to Ginger.

Post-divorce increases in the value of an individual's defined-benefit retirement plans that are attributable to the person's continued employment, such as raises, promotions, services rendered, and post-divorce contributions, are the individual's separate property and are not subject to division. *See Grier v. Grier,* 731 S.W.2d 931, 932 (Tex.1987) (op. on reh'g) (holding that retirement benefit increases due to post-divorce promotion were separate property); *Burchfield,* 968 S.W.2d at 424 (listing types of post-divorce increases in benefits that are separate property). But post-divorce cost-of-living increases and other increases in value that are not attributable to the employee's continued employment after divorce are community property subject to division. *See Grier,* 731 S.W.2d at 933 (awarding nonemployee wife percentage of husband's retirement benefits that were community property valued at date of divorce plus future increases *other than* those attributable to post-divorce elevation in rank or services rendered); *Reiss v. Reiss,* 40 S.W.3d 605, 611

n. 5 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (noting that post-divorce cost-of-living increases and interest accruing on nonemployee spouse's community portion of retirement benefits are subject to community property division); *Bloomer v. Bloomer,* 927 S.W.2d 118, 121 (Tex.App.-Houston [1st Dist.] 1996, writ denied) (op. on reh'g) (awarding nonemployee spouse 50% interest in cost-of-living increases associated with retirement benefits that were community property); *Sutherland v. Cobern,* 843 S.W.2d 127, 131 (Tex.App.-Texarkana 1992, writ denied) (holding that cost-of-living increases are not the result of any post-divorce labor, but rather are a means of offsetting the otherwise declining value of retirement benefits after they become fixed); *Phillips,* 814 S.W.2d at 504 (awarding nonemployee spouse her share of post-divorce cost-of-living increases and increases due to upgrading of benefits); *see also Burchfield,* 968 S.W.2d at 424 (holding that post-divorce increases in an individual's retirement benefits are subject to community property division if they are not attributable to post-divorce employment or contributions).[8]

Applying these principles to this situation, we reject Randall's argument that Ginger was not entitled to an interest in the portions of his defined benefit plans that had not vested by the time of divorce.

---

7. At divorce, the trial court found the plans were valued as follows: $58,197 (plan B, above); $92,919 (plan C); $162,302 (plan D); and $25,652 (plan E). Of these amounts, Ginger received 50%, or: $29,098 (plan B); $46,459 (plan C); $81,151 (plan D); and $12,826 (plan E).

8. *But see Berry,* 647 S.W.2d at 947 (rejecting, without analysis, concept of inflation as factor to be considered in determining post-divorce retirement benefits); *May,* 716 S.W.2d at 711 (holding that *Berry* prohibits nonemployee spouse from sharing in *any* post-divorce increases in value of employee's retirement ben-

efits); *Dunn v. Dunn,* 703 S.W.2d 317, 321 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.) (rejecting, based on *Berry,* nonemployee spouse's claim that cost-of-living increases and inflation should be included in her community share of employee spouse's retirement). In light of *Grier,* which was decided later than *Berry,* we decline to follow this line of cases. We also note that the *Berry* court concluded that the employee spouse had met his burden of proof regarding the effect of inflation on his retirement benefits. 647 S.W.2d at 947.

The unvested benefits were a contingent property interest subject to division in the divorce decree. *Cearley,* 544 S.W.2d at 665–66. We also hold that Ginger is entitled to a 50% interest in any increases in the value of the plans that are not attributable to Randall's post-divorce employment. Ginger is not, however, entitled to any part of the post-divorce increases in the value of Randall's defined benefit plans that are attributable to his continued employment after divorce or to contributions of his separate property.

Ginger asserts that the use of the term "future employment" in the divorce decree was not to award her any of Randall's separate property arising from his post-divorce employment. Rather, "future employment" was used to describe the retirement *plans* as existing because of Randall's employment, whether past, present, or in the future. This assertion is supported by the record. When this language was discussed in the trial court, Ginger's attorney stated: "The term, future employment that he complains about does not award anything to Ginger Boyd for future employment. It simply describes the *retirement plan* as being one that's based on employment including past, present, and future employment." [Emphasis added.] Randall does not direct us to any evidence to the contrary. Based on this record, we do not interpret the trial court's use of "future employment" as awarding Ginger any interest in the retirement benefits that will arise by virtue of Randall's post-divorce employment. We hold that the trial court's division of the defined benefit plans was not an abuse of its discretion.

### 2. Defined Contribution Plans

■■■ Randall's 401(k) plan is a defined contribution plan. To determine the community property value of a defined contribution plan, courts subtract the value of the plan at the time of the marriage from the value at divorce. *Smith,* 22 S.W.3d at 149; *Baw,* 949 S.W.2d at 767–68; *Hatteberg v. Hatteberg,* 933 S.W.2d 522, 530–31 (Tex.App.-Houston [1st Dist.] 1994, no writ); McKnight, *Family Law,* 50 SMU L.Rev. at 1202. Thus, the equation for calculating the nonemployee spouse's share of a defined contribution plan is:

$$\frac{1}{2}^9 \times (\text{value of plan at divorce—value of plan at marriage}) = \text{nonemployee spouse's share}$$

■■■ Once again, Randall's complaint is about the award to Ginger of a one-half interest in any post-divorce increases in the value of his 401(k) plan, not about the 50–50 division of the plan value at divorce. Ginger agrees that she is not entitled to an interest in the future increases in the value of Randall's 401(k) plan to the extent that the increases result from post-divorce contributions of his separate property.

Our research has not revealed any cases in which a court has addressed whether a nonemployee spouse is entitled to post-divorce increases in the value of a defined contribution plan that are not attributable to the employee spouse's continued employment. Randall's 401(k) plan was valued at $166,777 at the date of divorce and the divorce decree awards Ginger 50% of that amount, or $83,388. Post-divorce increases in the value of the $83,388 will not be attributable to Randall's post-divorce employment or to his contributions of separate property to the plan. Thus, the

---

9. The community share of the plan value, although presumed to be one-half, is subject to the trial court's just and right division. *See* Tex. Fam.Code Ann. § 7.001; Brown, *An Interdisciplinary Analysis,* 37 Baylor L.Rev. at 136.

future increases in Ginger's share will not be Randall's separate property, and they were subject to the trial court's just and right division. *See* TEX. FAM.CODE ANN. § 7.001; *Osborn*, 961 S.W.2d at 413–14. To the extent that the future increases in value are attributable to Randall's continued employment or to contributions of his separate property, however, they will be Randall's separate property and were not subject to division at divorce. But as we stated in our discussion of the defined benefit plans, we do not, on this record, interpret the trial court's use of "future employment" as awarding Ginger any interest in Randall's 401(k) plan that will result from his post-divorce employment or contributions of his separate property. Thus, the trial court's division of Randall's 401(k) plan was not an abuse of discretion.

We overrule point eight.

### C. Stock Options

In his ninth point, Randall complains that the trial court improperly characterized his stock options as 100% community property when they were actually partly his separate property. At divorce, the trial court is charged with determining the rights of both spouses in employee stock option plans and stock options. TEX. FAM. CODE ANN. § 7.003 (Vernon 1998).

The divorce decree awards Ginger:

One-half (50%) of the "fair value" options to purchase shares in Onex Food Services, Inc. held in the name of Randall C. Boyd subject to the terms of the trust hereinafter described concerning the other one-half (50%) of the options to purchase shares as a result of owning the "fair value" options.

Randall purchased all of the stock options in November 1998, so he acquired them while he and Ginger were married. Also, none of the stock options were awarded for work done outside of the parties' marriage. Randall was given the opportunity to purchase the stock options because of his management position with his company. The stock option plan recites that management employees were given this opportunity in order to motivate them to exert their best efforts on behalf of the company. However, because Randall bought the stock options in 1998, they were not something that would be awarded in the future for continued employment after the divorce.

Texas courts have consistently held that stock options acquired during marriage are a contingent property interest and a community asset subject to division upon divorce. *Kline v. Kline*, 17 S.W.3d 445, 446 (Tex.App.-Houston [1st Dist.] 2000, pet. denied); *Charriere v. Charriere*, 7 S.W.3d 217, 219 (Tex.App.-Dallas 1999, no pet.); *Bodin v. Bodin*, 955 S.W.2d 380, 381 (Tex.App.-San Antonio 1997, no pet.); *Demler v. Demler*, 836 S.W.2d 696, 699 (Tex.App.-Dallas 1992, no writ). The fact that stock options are not fully vested by the time of divorce does not affect their character as community property, as long as the options were acquired during the marriage. *Kline*, 17 S.W.3d at 446; *Bodin*, 955 S.W.2d at 381; *see also Cearley*, 544 S.W.2d at 665–66 (holding that employee spouse's accrued but unvested retirement benefits are a contingent property interest and a community asset). *But see Acosta v. Acosta*, 836 S.W.2d 652, 654 (Tex.App.-El Paso 1992, no writ) (holding that stock plan to which employer and employee spouse both made contributions and whose value was dependent on length of employee spouse's employment was a deferred compensation retirement plan); *In re Marriage of Joiner*, 755 S.W.2d 496, 498 (Tex.App.-Amarillo 1988, no writ) (holding that employee spouses's interest in his company's profit sharing stock plan awarded for work done

outside of marriage was spouse's separate property).

Because Randall's fair value stock options were acquired during the marriage, they were a contingent community property interest, and the trial court did not abuse its discretion by dividing all of the options between Randall and Ginger.

■■■ Randall also contends that the trial court should have valued the stock options as of the date of divorce rather than giving Ginger the benefit of the value of the options attributable to his post-divorce employment. Thus, Randall lodges the same complaint regarding the stock options as he did concerning the retirement benefits: Ginger was not entitled to 50% of the future increases in the value of the stock options.

Randall's company was privately held, not publicly traded. If Randall left his employment before he was 100% vested in his stock options, he could sell the options to the company for the price he paid for them. But Randall's ability to exercise his stock options for a profit was contingent upon his employer becoming a publicly traded company or being wholly or partially acquired by a third party. In either of these circumstances, Randall would have the opportunity to sell his stock options for the price the company received for its shares.

Randall's stock options vested at the rate of 1% per year from 1998 through 2006, after which they became entirely vested. However, if Randall's company went public or was substantially acquired by a third party, vesting was accelerated to 20% per year. If there was a total sale of the company, Randall would be treated as if he were 100% vested.

The trial court determined that Randall's fair value stock options had a contingent value at divorce of $5,628,776. This value was determined by using a formula that did not take into account Randall's post-divorce work for his company or the company's future productivity. The formula was fixed at the time of the divorce.

The contingent value of the stock options could not be realized, however, until between 2002 and 2004, during which time a third-party corporation had the option to acquire all of the remaining stock in Randall's company. If Randall was not employed by the company at that time, he would not make any more profit on his fair value stock options because he would no longer be a company stockholder. In addition, even if his employment continued after divorce, Randall would not make any more profit on the stock options if the sale did not occur or if his company's stock did not become publicly traded after 2004.

To date, no Texas court has considered how to determine the community property value of stock options at divorce. The cases have only addressed whether stock options are community property. *See Kline*, 17 S.W.3d at 446; *Bodin*, 955 S.W.2d at 381; *Demler*, 836 S.W.2d at 699; *see also Charriere*, 7 S.W.3d at 220 n. 6 (holding that stock options that could be purchased but not sold without company consent during marriage were community property, even though value of options was dependent upon employee spouse's post-divorce employment). The factors presented here cause us to conclude that the contingent value of the stock options was community property. The method for calculating this contingent value was fixed at divorce, and the minimum price for the stock options was also fixed. Randall would either be able to exercise the stock options in the future for their contingent value (if he was employed and the stock sale took place or the company went public), or he would only be able to recover

what he paid for them. Further, the contingent value of the options was not dependent on Randall's post-divorce *work* for his company, even though he had to be employed to receive it.

The trial court awarded Ginger one half of the contingent value of the stock options as her 50% share of the community estate. If Randall is no longer employed when the stock options are sold, Ginger's contingent community property interest will be extinguished. Any post-divorce increases or decreases in the value of these stock options that are not attributable to Randall's post-divorce work will not be his separate property. Ginger will be entitled to 50% of the increases, and the contingent value of her interest will be reduced by any decreases. Ginger will not be entitled to any post-divorce increases in the value of these stock options that *are* attributable to Randall's post-divorce work for the company because these post-divorce increases will be his separate property. However, the divorce decree does not contain any language purporting to give Ginger an interest in these latter post-divorce increases. Therefore, the trial court's division of the contingent value of the stock options was not an abuse of discretion. We overrule point nine.

## D. Constructive Trustee

In his tenth point, Randall complains that the trial court improperly made him a constructive trustee for Ginger with regard to the stock options and improperly burdened him with duties related to Ginger's share of the options. Randall does not cite any legal authority for his position that the trial court's rulings were improper. Further, because Randall's stock and stock options could only be held in his name, he proposed at trial to act as trustee for Ginger's share of his stock and testified that the "same mechanism would work"

for his stock options. In addition, Randall's attorney stipulated that Randall "will act as a constructive trustee for whatever interest there is.... We don't have a problem with that." We overrule point ten.

## E. Duties Imposed on Randall's Employer and Internal Revenue Service

In point eleven, Randall contends that the divorce decree erroneously imposes certain duties on his employer and the Internal Revenue Service. Randall does not explain how he has standing to make this complaint. Standing pertains to a person's justiciable interest in a lawsuit. *Roman Forest Pub. Util. Dist. v. McCorkle,* 999 S.W.2d 931, 932 (Tex.App.-Beaumont 1999, pet. denied); *AU Pharm., Inc. v. Boston,* 986 S.W.2d 331, 340 (Tex.App.-Texarkana 1999, no pet.). A person has standing to sue when he is personally aggrieved by the alleged wrong. *Nootsie Ltd. v. Williamson County App. Dist.,* 925 S.W.2d 659, 661 (Tex.1996). Without a breach of a legal right belonging to an individual, however, he has no standing to litigate. *Cadle Co. v. Lobingier,* 50 S.W.3d 662, 670 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g); *Pankhurst v. Weitinger & Tucker,* 850 S.W.2d 726, 729 (Tex. App.-Corpus Christi 1993, writ denied). Assuming for the sake of argument that the divorce decree imposes duties on Randall's employer and the IRS and that the imposition is improper, the employer's and the IRS's rights were the ones violated, not Randall's. Accordingly, Randall has no standing to assert this complaint.

Randall also complains that certain paragraphs of the divorce decree require him to disclose his company's proprietary information to Ginger. Randall does not point to any terminology that would require him to disclose proprietary information. We do not read the paragraphs as

requiring him to do anything but give Ginger the same notice regarding the stock options that an employee shareholder would receive. We overrule point eleven.

## F. Debt Assessed Against Ginger

In the divorce decree, the trial court assessed against Ginger one half of the purchase money debt for the stock options, plus "interest accrued and paid on that part of the debt." In point twelve, Randall contends that the decree should be reformed to require Ginger to pay the interest that was accrued but unpaid at the time of divorce and the interest that would come due on the debt after divorce. The divorce decree assesses this interest against Ginger also, by assessing against her one half of the debt "plus interest charges, related to the purchase of the 'fair value' shares, to be paid from the proceeds of the sale or conversion of the options being held in trust for Ginger . . . ."

Randall further contends, however, that Ginger should be required to pay the interest on the debt as it comes due, rather than upon liquidation. He asserts that the current arrangement will divest him of his separate property. We have held that the stock options Randall held at the time of divorce were not his separate property. Accordingly, we fail to see how repaying Ginger's share of the interest on the stock options' purchase money debt out of her share of the proceeds will divest Randall of his separate property. Moreover, Randall testified that he purchased and financed the stock options with community assets and pledged community assets—stock in his company acquired during the marriage—as collateral for the options. There is also evidence that the purchase money loan was a full recourse loan, so that all of the community assets are at risk if the loan is not repaid. In light of this evidence, we hold that the trial court did not abuse its discretion in structuring Ginger's repayment of her portion of the interest. We overrule point twelve.

## G. 1999 Bonuses

■■■ The divorce decree awards Ginger 50% of all amounts withheld from Randall's 1999 bonus checks, including amounts withheld for income, Medicare, and other taxes, insurance payments, and interest payments. In his thirteenth point, Randall asserts that the trial court could not award Ginger one half of these amounts because state courts have no power to interfere in federal tax issues and because the sums withheld for insurance and interest payments were gone by the time of divorce and not subject to division.

■■■ The earnings of a spouse during marriage are community property. *Ruiz v. Ruiz*, 668 S.W.2d 866, 867 (Tex.App.-San Antonio 1984, no writ). The parties were not divorced until December 13, 1999. Therefore, all bonuses Randall received through December 13, 1999 were community property, and Randall makes no assertion to the contrary. The divorce decree does not require Randall's employer or the IRS to give to Ginger the actual money withheld for taxes, insurance, and interest; it simply awards Ginger 50% of these *amounts*. During the marriage, Randall earned the portions of his 1999 bonuses that were withheld; thus, these amounts were community property, and the trial court did not abuse its discretion by dividing them between Randall and Ginger. We overrule point thirteen.

## H. Property Division as a Whole

In light of our disposition of points one through thirteen, we need not consider Randall's fourteenth point, in which he asserts that we must remand the entire community estate to the trial court for a new division because the trial court erro-

neously failed to render judgment on the M.S.A. and characterized as community property some property that was actually his separate property.

## V. Conclusion

Having disposed of all of Randall's points on appeal, we affirm the trial court's judgment.