

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00362-CV

Steve **NUNEZ**,
Appellant

v.

Alma Idalia **NUNEZ**,
Appellee

From the 63rd Judicial District Court, Val Verde County, Texas
Trial Court No. 34916
Honorable Sid L. Harle, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:        Patricia O. Alvarez, Justice
                Liza A. Rodriguez, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: June 20, 2024

AFFIRMED

Steve Nunez ("Steve") appeals the trial court's final decree of divorce. On appeal, he argues the trial court erred (1) in awarding a disproportionate share of the marital estate to Alma Idalia Nunez ("Alma"); (2) in awarding spousal maintenance to Alma; and (3) in dividing his Federal Employees Retirement System benefits in a manner that will divest him of his separate property. We affirm.

**DISPROPORTIONATE AWARD OF MARITAL ESTATE TO ALMA**

In the final decree, the trial court awarded Alma sixty percent, and Steve forty percent, respectively, of (1) the net proceeds from the sale of the home; (2) the Thrift Savings Plan[1]; and (3) the benefits under the Federal Employees Retirement System. In his first issue, Steve argues the trial court erred in awarding Alma a disproportionate percentage of the marital estate, claiming that the trial court "incorrectly attributed fault to [him] in the break up of the marriage and used said fault in making an unequal division of the marital estate." As pointed out by Alma, however, the trial court's judgment states only that the marriage was dissolved on the basis of adultery. It does not specifically state that adultery was the basis for awarding Alma a disproportionate portion of the estate. Thus, we look at all the factors a trial court may consider in awarding a disproportionate share to one of the parties.

Section 7.001 of the Family Code requires a trial court to divide the estate in a manner that it "deems just and right." TEX. FAM. CODE § 7.001. If a trial court chooses to divide a marital estate unequally, it must have a reasonable basis for doing so. *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.). In deciding whether a reasonable basis exists for an unequal division of the marital estate, a trial court may consider many factors, including (1) the spouses' capacities and abilities; (2) the benefits that the party not at fault would have derived from the continuation of the marriage; (3) any business opportunities; (4) the relative physical conditions of the parties (5) the relative financial conditions of the parties; (6) the disparity of the parties' ages; (7) the size of the separate estates; (8) the nature of the property; and (9) the disparity of income or earning capacity. *Kaftousian v. Rezaeipanah*, 511 S.W.3d 618, 621-22 (Tex. App.—El

---

[1] "The Thrift Savings Plan is a defined-contribution plan similar to a 401(k) that is available to civil-service employees who want to supplement their retirement-annuity benefits under . . . FERS." Randall B. Wilhite et al., O'CONNOR'S TEX. FAM. LAW HANDBOOK § 10.1 (2024) (quoting Shulman, QUALIFIED DOMESTIC RELATIONS ORDER HANDBOOK ch. 2-A, § 30.10 (3d. ed. 2006 & Supp. 2017)).

Paso 2015, no pet.) (citing *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981)). We review a trial court's division of marital property for an abuse of discretion. *Murff*, 615 S.W.2d at 698. A trial court "enjoys wide latitude in dividing the marital estate," and we "presume that the trial court properly exercised its discretion in reaching its decision." *Kaftousian*, 511 S.W.3d at 621 (citing *Murff*, 615 S.W.2d at 698-700). Thus, "we will not overturn that division unless the complaining party demonstrates that it was so unjust and unfair as to constitute an abuse of discretion." *Id.* (citing *Murff*, 615 S.W.2d at 698).

The record reflects that Alma and Steve married on July 6, 1991, and separated on September 9, 2018. Thus, they were married for twenty-seven years. They have three children, who were all adults at the time of the divorce proceedings.

From September 8, 2022 through the time of trial, Steve worked for Border Patrol in the Department of Homeland Security and thus is part of the Federal Employees Retirement System ("FERS"). His retirement under FERS has no cash value because it is an annuity, which cannot be determined until he retires. He testified he is not eligible yet to begin collecting on his FERS benefits and will have "to accumulate age and time of eighty years" before he will be eligible. Steve testified that at the end of every year, he receives a statement showing how much his monthly retirement payment would be based on current information. He testified that he also contributes to a retirement Thrift Savings Plan ("TSP"), which at the time of trial had a balance of $135,734.73. As a border patrol agent, Steve's net earnings every two weeks were $2,077.08, or $4,500.34 per month, which did not include overtime pay.[2] Steve's 2017 W-2 earnings and tax statement showed that he earned $114,626.75 working as a border patrol agent. His 2018 W-2 earnings and tax

---

[2]As a federal employee paid every two weeks (and not twice a month), Steve receives two more payments per year, or twenty-six payments for the fifty-two-week year, than an employee paid twice a month, who will receive only twenty-four payments.

statement showed that he earned $120,674.96 as a border patrol agent. Additionally, Steve testified that he had a side business of tax preparation for which he earned an extra $24,800 in 2019.

Alma and Steve owned a home together, which was still encumbered by a mortgage at the time of trial. They paid $265,000 for the home on July 1, 2015, and Steve testified the value of the home at the time of trial was $300,000. According to Steve, the balance on the mortgage was $219,187.60, which resulted in $80,000 of equity in the home. Alma testified that the assessed value of the home was $264,110. Alma testified she had a retirement account in the amount of $6,168.78. She testified the value of the assets of the marital estate was $192,808.14, which included equity in the house, equity in the vehicles, and the value of the TSP and Alma's retirement account. She testified the total debts of the marital estate were $39,717.26.

Steve testified he completed high school and three years of college. He also completed six months of training in South Carolina to be a border patrol agent. Because they had three children at the time he underwent training in South Carolina, Alma took care of the children at home and was not employed. Steve was also "in charge of recruiting" and "would go out of town." Steve was the primary breadwinner of the family and was away for his job many times. Alma was a homemaker and the primary caregiver to the children. Alma testified that by taking care of the home and the children, she supported Steve's career.

At the time of trial, Alma testified she was making $14.50 per hour and was working forty hours per week for a total of $560 per week, which netted her $451.91 after taxes. Thus, her monthly net income was $1,807.64, and her annual net income was $21,691.68. Alma testified her monthly expenses were $2,229.97. Thus, her monthly income was insufficient to pay her expenses, resulting in a shortfall of $271.69 every month. Steve claimed Alma netted about $1,958.28 per month. He agreed that her salary was not sufficient to pay the mortgage, car payment, insurance, utilities, and all the other monthly bills.

Regarding her ability to make money, Alma testified that she had only been able to work on and off during the marriage. Alma has a high school education. She testified Steve had not supported her attending college. According to Alma, the only times she was able to attend any college classes was when the children were little, and when she and Steve had separated. She attended "American Commercial College" and took a couple of classes at a time. She had to pay for the classes herself from money she was earning at a construction company. She did not qualify for financial aid because Steve earned too much money. When they reconciled, Steve was not supportive of her attending college and told her that she never "finish[ed] anything that [she] start[ed]." Alma testified that she was able to finally finish and found a job in her field.

Steve testified that Alma had a cosmetology license and a certification to enter medical data. He testified she had also been an administrative assistant for a construction company. According to Steve, Alma had an education "above high school" and "technical school," but agreed she did not have a bachelor's degree.

Alma testified that Steve managed all the money and paid all the bills. He gave her an allowance of $175 for every paycheck he earned, which was deposited into a separate bank account. She had to use her allowance to buy whatever she needed and was not allowed to touch the other bank account.

Alma testified at trial that she knew of four different instances where Steve had an extramarital affair. The first affair she knew of occurred when they were living in San Angelo, and he left the house for a week. Alma saw Steve and a woman together at the movies and confronted Steve. They later reconciled. Alma later found out about the second affair, which occurred in Laredo, when Alma's friend saw Steve holding hands with a woman and also holding the woman's child. Alma testified Steve admitted to her that he had been seeing the woman but denied a sexual relationship. When Alma confronted the woman, the woman told Alma that Steve had lied and

told her he was single and lived in Laredo by himself. Alma and Steve again reconciled. Alma discovered the third affair when she and Steve were riding in their pickup truck and she could hear what a woman was saying to Steve on his cell phone. Steve denied he was having an affair, but Alma became aware of texts between the woman and Steve, which showed they were having an affair. Alma and Steve reconciled for the third time. Alma testified that Steve's fourth affair was the reason they separated and began divorce proceedings. At trial, Steven admitted that he started dating a twenty-two-year-old woman "right towards the end" of the marriage and that they had a three-month-old child together. Steve admitted that he told Alma that his relationship with this new woman made it easier for him to leave the marriage. He also admitted that his oldest daughter had walked into his and Alma's home and saw him talking to this new woman on the sofa. Alma testified this last affair had damaged the entire family, resulting in Steve and their son not speaking to each other. Alma testified that for a week, she and Steve had tried to reconcile but then she realized he was still messaging the woman and that Steve was lying to her when he said he was not in contact with the woman.

We note that the trial court, as the factfinder, had "the opportunity to observe the parties on the witness stand, determine their credibility, [and] evaluate their needs and potentials, both social and economic." *Murff*, 615 S.W.2d at 700. "As the trier of fact, the court is empowered to use its legal knowledge and its human understanding and experience." *Id*. "Although many divorce cases have similarities, no two of them are exactly alike." *Id*. "Mathematical precision in dividing property in a divorce is usually not possible." *Id*. "Wide latitude and discretion rests in these trial courts and that discretion should only be disturbed in the case of clear abuse." *Id*. Based on the above evidence, we find no abuse of discretion by the trial court in dividing the marital estate. *See id*. In considering the factors above, there was evidence to support the trial court reasonably concluding that during the marriage (1) Steve had more capacity and ability to earn money than

Alma; (2) Alma had supported Steve in his efforts to reach that higher capacity; (3) Steve had not supported Alma's efforts to reach a higher earning potential; (4) Alma's annual income was only about eighteen percent of Steve's annual income; and (5) Steve was at fault for the marriage ending. *See id.* at 699. Thus, Steve has not shown on appeal that the division of the marital estate was "so unjust and unfair as to constitute an abuse of discretion." *Kaftousian*, 511 S.W.3d at 621 (citing *Murff*, 615 S.W.2d at 698).

### Spousal Maintenance

The trial court found that Alma was eligible for spousal maintenance and ordered Steve to pay as maintenance in the sum of $1,534.47 per month until the earliest of the following events occurs: (1) two years from entry of judgment; (2) the death of either Steve or Alma; (3) the remarriage of Alma; or (4) any further orders of the trial court affecting spousal maintenance, including a finding of cohabitation by Alma. In his second issue, Steve argues Alma was not eligible for spousal maintenance under section 8.051 of the Texas Family Code because she received "more income [in the final decree] than [her] proven minimum reasonable needs." Thus, Steve argues that Alma does not lack sufficient assets to provide for her reasonable minimum needs after the divorce.

"We review a trial court's decision regarding spousal maintenance under an abuse of discretion standard." *Wiedenfeld v. Markgraf*, 534 S.W.3d 14, 18 (Tex. App.—San Antonio 2017, no pet.). "Under the abuse of discretion standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors in assessing whether the trial court abused its discretion." *Id.* Where there is conflicting testimony, we defer to the trial court's credibility determination and resolve the conflict in favor of the trial court's ruling. *In re Marriage of McFarland*, 176 S.W.3d 650, 652 (Tex. App.—Texarkana 2005, no pet.).

"The purpose of spousal maintenance is to provide temporary and rehabilitative support for a spouse whose ability for self support has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support." *Greco v. Greco*, No. 04-07-00748-CV, 2008 WL 4056328, at *7 (Tex. App.—San Antonio Aug. 29, 2008, no pet.). Section 8.051 provides in relevant part that a trial court may order spousal maintenance "if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs" and the spouse seeking maintenance "has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs." TEX. FAM. CODE § 8.051(2)(B). "When, as here, a divorce is sought in a marriage lasting ten years or longer [under subsection (2)(B)], a spouse is eligible to seek spousal maintenance if the spouse lacks (1) sufficient property, including property awarded to the spouse in the divorce proceeding, to meet the spouse's minimum reasonable needs, and (2) the ability to earn sufficient income to provide for the spouse's minimum reasonable needs." *Saucedo v. Aguilar-Saucedo*, No. 04-21-00298-CV, 2022 WL 4492099, at *1 (Tex. App.—San Antonio Sept. 28, 2022, no pet.). Further, "under subsection (2)(B), there 'is a rebuttable presumption that [spousal] maintenance . . . is not warranted unless the spouse seeking maintenance has exercised diligence in: (1) earning sufficient income to provide for [her] minimum reasonable needs; or (2) developing the necessary skills to provide for [her] minimum [reasonable] needs' while the parties were separated and the case was pending." *In re Cooper*, No. 06-22-00093-CV, 2023 WL 3766574, at *2 (Tex. App.—Texarkana June 2, 2023, no pet.) (quoting TEX. FAM. CODE § 8.053(a)) (alterations in original). "The term 'minimum reasonable needs' is not defined in the Family Code." *Diaz v. Diaz*, 350 S.W.3d 251, 254 (Tex. App.—San Antonio 2011, pet. denied). Rather, "determining what the 'minimum reasonable needs' are for a particular individual is a fact-specific determination which

must be made by the trial court on a case-by-case basis." *Id*. "While a list of expenses is helpful, such a list is not the only evidence upon which a trial court can determine a person's 'minimum reasonable needs.'" *Id*.

In support of his argument that Alma will have sufficient assets awarded in the divorce decree to meet her minimum reasonable needs, he points to money she should acquire from the sale of their home and money she will receive from the TSP retirement account. "The purpose of spousal maintenance is to provide *temporary* and rehabilitative support for a spouse whose ability for self-support has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support." *Trueheart v. Trueheart*, No. 14-02-01256-CV, 2003 WL 22176626, at *3 (Tex. App.—Houston [14th Dist.] Sept. 23, 2003, no pet.) (emphasis in original). "In considering assets awarded in the divorce, the law does not require a spouse to spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet needs in the short term." *Id*.; *see also Turner v. Turner*, No. 04-23-00142-CV, 2024 WL 2034723, at *4 (Tex. App.—San Antonio May 8, 2024, no pet. h.) (same). Thus, we find unpersuasive Steve's argument that before Alma can be eligible for spousal maintenance, to provide for her temporary and rehabilitative support, she must use the funds she received from the home (a long-term asset) and from the TSP retirement fund. *See Trueheart*, 2003 WL 22176626, at *3 (rejecting husband's argument that ex-wife was required to liquidate retirement account or life insurance policy before she could be eligible for spousal maintenance); *see also Turner*, 2024 WL 2034723, at *4 (rejecting husband's argument that his ex-wife was not eligible for spousal maintenance because she could "meet her minimum reasonable needs by selling one of the cars she was awarded in the decree").

Here, there was evidence that at the time of trial, Alma was almost fifty years old and had spent most of her adult life as a homemaker supporting the family and Steve's career. There was

evidence that the efforts Alma made to further her education were not supported by Steve and that despite his support, Alma had managed to obtain some higher education credits. At the time of trial, she earned a mere $14.50 per hour and was working forty hours per week for a total of $560 per week, which netted her $451.91 after taxes. Thus, her monthly net income was $1,807.64, and her annual net income was $21,691.68. There was evidence that her monthly income was insufficient to pay her expenses. We conclude that from the evidence in this record, the trial court could reasonably conclude Alma met her burden to rebut the statutory presumption against spousal maintenance and thus did not abuse its discretion in determining Alma was eligible for spousal maintenance. *See Turner*, 2024 WL 2034723, at \*4; *see also Trueheart*, 2003 WL 22176626, at \*2-3 (holding that despite being awarded $290,000 in long-term assets, trial court did not abuse discretion in determining forty-eight-year-old wife who had spent the majority of her marriage as a homemaker and had little higher education and job skills was eligible for spousal maintenance).

**FERS BENEFITS**

In his third issue, Steve argues the trial court erred in dividing the FERS benefits because the division divested him of his separate property. Specifically, Steve contends that the trial court's award of FERS benefits to Alma exceeded the community estate in the retirement benefit because it did not establish the value of the retirement benefits at the time of the divorce and failed to limit the award to the value of the benefits at the time of the divorce. Thus, he argues "the award impermissibly invades upon [his] separate property and estate."

"Retirement plans are commonly classified as either a defined contribution plan or a defined benefit plan." *Brazell v. Brazell*, No. 04-13-00491-CV, 2014 WL 1871361, at \*1 (Tex. App.—San Antonio May 7, 2014, pet. denied) (citing *Reiss v. Reiss*, 118 S.W.3d 439, 440 n.1 (Tex. 2003)). "In a defined contribution plan, the employee has a separate account similar to that of a savings account into which the employee and employer make contributions." *Id*. (citing *Smith*

*v. Smith*, 22 S.W.3d 140, 148-49 (Tex. App.—Houston [14th Dist.] 2000, no pet.)). "The value of a defined contribution plan is readily ascertainable at any time simply by looking at the account balance." *Id*. (citing *Baw v. Baw*, 949 S.W.2d 764, 768 (Tex. App.—Dallas 1997, no pet.)). "In contrast, a defined benefit plan promises the employee a monthly benefit beginning at retirement." *Id*. at *2 (citing *Smith*, 22 S.W.3d at 148). "If a plan is a defined benefit plan, apportionment of the benefit is based on the number of years of service the employee has at the time of retirement, along with other factors such as age and salary history." *Id*. "Apportioning defined benefit plans upon divorce is difficult because their value at any given time is difficult to ascertain." *Id*. "An employee spouse's accrued benefits in a defined benefit plan that have been earned during marriage, but have not vested and matured at the time of divorce, are a contingent property interest and a community asset subject to division upon divorce." *Id*. (citing *Boyd v. Boyd*, 67 S.W.3d 398, 407 (Tex. App.—Fort Worth 2002, no pet.)).

FERS is a defined benefit plan. Steve testified at trial that his benefits pursuant to FERS had no cash value at the time of trial because it is an annuity; thus, the value cannot be determined until he retires. It is undisputed that when Steve began his job with border patrol and thus began earning retirement benefits under FERS, he was married to Alma. Therefore, Steve's earned retirement benefits up to the time of the divorce are community property subject to division in the divorce. *See Berry v. Berry*, 647 S.W.2d 945, 946 (Tex. 1983). Any benefits Steve earns after the divorce are his separate property. *Gainous v. Gainous*, 219 S.W.3d 97, 109 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). On appeal, he argues that the trial court did not "value" his retirement benefits at the time of the divorce and thus his future separate retirement benefits are subject to being taken by Alma.

As noted, it is undisputed that Steve is not currently collecting any benefits under FERS and that the "value" of his benefits cannot be ascertained until he is eligible to collect benefits

under FERS. *See* 5 U.S.C. §§ 8336, 8339(a); *Kadlecek v. Kadlecek*, 93 S.W.3d 903, 906 (Tex. App.—Austin 2002, no pet.) ("[A] qualified civil-service employee, at retirement, is entitled to retirement benefits which will provide monthly payments to the retiree during the retiree's lifetime."). Under Texas law, it is not necessary that Steve's retirement benefits either be accrued or matured for the benefits to be subject to division. *Cearley v. Cearley*, 544 S.W.2d 661, 665-66 (Tex. 1976). "An employee spouse's accrued benefits in a defined benefit retirement plan that have been earned during marriage, but have not vested and matured at the time of divorce, are a contingent property interest and a community asset subject to division upon divorce." *Boyd*, 67 S.W.3d at 407 (citing *Cearley*, 544 S.W.2d at 665-66).

Thus, in 1983, the Texas Supreme Court established "a formula for determining the extent and value of the community interest in an employee spouse's defined-benefit plan, when[, as in this case,] the latter began plan participation during marriage but retired after divorce." *Douglas v. Douglas*, 454 S.W.3d 591, 596 (Tex. App.—El Paso 2014, no pet.) (citing *Berry*, 647 S.W.2d at 946-47). "Under the *Berry* formula, the extent of the community's interest is determined by dividing the number of months married under the plan by the number of months employed under the plan at the time of divorce and the value of the interest is determined as of the date of the divorce rather than as of the date of retirement." *Id*. (citing *Berry*, 647 S.W.2d at 946–47). The formula "excludes post-divorce increases in the employee spouse's retirement benefits—such as raises, promotions, services rendered, and contributions—that are the employee spouse's separate property because they are attributable to his continued employment after divorce." *Gainous*, 219 S.W.3d at 109. This formula represents "the payments that hypothetically would have been due if, on the date that the employed spouse's marital status changed, the benefits were vested and matured and he retired." *Sprague v. Sprague*, 363 S.W.3d 788, 795 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). "In other words, the value of the community interest in a defined benefit

plan is expressed as a fraction of the monthly annuity payments." *Windham v. Windham*, No. 13-20-00118-CV, 2022 WL 242752, at *3 (Tex. App.—Corpus Christi-Edinburg Jan. 27, 2022, no pet.). "Because such payments continue for the life of the retiree, the community interest in those payments cannot be valued as a fixed sum at the time of divorce." *Id*.

The divorce decree awarded Alma the following:

> The value of [Steve]'s [FERS] benefits arising out of [Steve]'s past or present employment, *from the date of marriage through November 30, 2020*, that portion being 60%, together with all rights and privileges arising therefrom. [Alma] is awarded cost-of-living adjustments as they are applied to Employee's retirement benefits, the same cost-of-living adjustments shall apply to Former Spouse's share. IT IS ORDERED that [Steve] is designated a constructive trustee for the benefit of [Alma] to the extent of 60% of those benefits. [Steve] is FURTHER ORDERED to provide to [Alma] true and correct copies of all documentation relevant to those benefits contemporaneously with the transfer of [Steve]'s portion of the distributions.

(emphasis added). The trial court's accompanying Order Dividing Federal Employees Retirement System Benefits "assigns a portion of the benefits payable with respect to Steve" under FERS to Alma "in recognition of the existence of Former Spouse's marital property rights in [Steve]'s benefits under Texas law." The order states that Steve "will be eligible for retirement benefits under [FERS] based on employment with the United States Government" and that Alma "is entitled to a share of those benefits, excluding any credits under [FERS] for military service, with that share being: *60 percent of [Steve]'s gross monthly annuity under [FERS] through the date of divorce, November 30, 2020*." (emphasis added). The order further states that "[w]hen cost-of living adjustments are applied to Employee's retirement benefits, the same cost-of-living adjustments shall apply to Former Spouse's share." The Order explicitly states that "[i]f any salary adjustments that occur after the date of the divorce decree and before Employee's date of retirement are applied to Employee's retirement benefits, *Former Spouse shall not benefit by reason of those salary adjustments*." (emphasis added).

Thus, the trial court awarded Alma sixty percent of the FERS benefits that accrued during the marriage up to the date of divorce and explicitly directs the Office of Personnel Management ("OPM") to not include any salary adjustments (i.e., Steve's separate property) after the date of divorce. *See* 5 C.F.R. § 838.622(c)(1) (providing that court order can prevent the application of salary adjustments after the date of divorce by stating the exact dollar amount of the award to the former spouse or specifically instructing the OPM not to apply salary adjustments after the specified date in computing the former spouse's share of the employee annuity). From this language in the decree, the OPM can calculate the amount of Alma's interest at the time of the divorce. *See id*. This language does not award Alma sixty percent of Steve's total benefits, but expressly limits her portion to sixty percent of the benefits earned from the date of Steve's employment to the date of divorce. *See id*. This language is thus consistent with *Berry* and does not award Steve's separate property to Alma. *See Windham*, 2022 WL 242752, at *4.

## Conclusion

For the reasons stated above, we affirm the trial court's final decree of divorce.

Liza A. Rodriguez, Justice