

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-07-298-CV

BRIAN E. HENDERSHOT                                    APPELLANT

V.

HEATHER L. HENDERSHOT                                  APPELLEE

-----------

FROM THE 324TH DISTRICT COURT OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

### I. Introduction

In four points, Appellant Brian Hendershot appeals from the trial court's judgment in his suit for divorce against Appellee Heather Hendershot, complaining that the trial court erred in its division of the parties' community estate. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual & Procedural History

The parties married in December 2001. Brian filed for divorce a little less than three years later, in October 2004, alleging only that the marriage had become insupportable because of discord or conflict of personalities. However, by the filing of his third amended original petition in 2007, Brian additionally alleged that Heather was at fault in the marriage's break-up and sought a disproportionate division of the community estate because of fault, her alleged waste of community assets, and the loss of the benefits he would have received from the marriage's continuation. Heather filed a counterpetition for divorce, seeking a disproportionate division of the community estate based on Brian's sale of portions of the business purchased by the parties during marriage and breach of fiduciary duty.

During the two-day trial, the trial court heard testimony from the parties about themselves and their assets. The trial court signed the divorce decree on June 1, 2007, dissolving the marriage on the ground of insupportability. The trial court divided the community estate, the value of which the parties had estimated between $1,081,790 and $1,114,643; however, because the trial court did not make any valuation findings, we do not know the percentage share of the marital estate each party received. Brian filed a motion for new

2

trial in July 2007, which the trial court denied after a hearing.  This appeal followed.

### III. Standard of Review

A trial court has broad discretion in making its "just and right" division of the marital estate.  Tex. Fam. Code Ann. § 7.001 (Vernon 2006); *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981).  Absent a clear abuse of discretion, we will not disturb that division.  *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974); *Boyd v. Boyd*, 67 S.W.3d 398, 406 (Tex. App.—Fort Worth 2002, no pet.).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles;  in other words, we must decide whether the act was arbitrary or unreasonable.  *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).  We must indulge every reasonable presumption in favor of the trial court's proper exercise of discretion in dividing marital property.  *Boyd v. Boyd*, 131 S.W.3d 605, 610 (Tex. App.—Fort Worth 2004, no pet.).  Accordingly, we will reverse only if the record demonstrates that the trial court clearly abused its discretion and the error materially affected the just and right division of the community estate.

3

*Id.*; *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

When an appellant challenges a property division, we will first determine whether the trial court had sufficient evidence upon which to exercise its discretion before evaluating whether the trial court abused that discretion. *Boyd*, 131 S.W.3d at 610; *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g). An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding). Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002). Our role in reviewing cases where property is divided in a divorce action is to determine only if there is an abuse of discretion in the property division, and if there is, to remand the case to the trial court. *See McKnight v. McKnight*, 543 S.W.2d 863, 866 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 7.001.

### IV. Discussion

Generally, Brian complains that the trial court divided the community property "in a manner that placed between 86[%] and 92% of the community estate" with Heather. Within that context, he has four specific complaints

4

about the trial court's property division: the trial court's assessment of the value of a "non-solicitation" contract to him and its failure to consider his fault grounds; the trial court's allocation of Heather's stock options and 401(k) entirely to Heather; and the award to Heather of $10,830 as her separate property.

## A. Community Property Division Factors

In exercising its discretion, the trial court must order an equitable, but not necessarily equal, division of the community estate. *Tenery v. Tenery*, 932 S.W.2d 29, 29–30 (Tex. 1996); *Taylor v. Taylor*, No. 02-05-00435-CV, 2007 WL 2460359, at *9 (Tex. App.—Fort Worth, Aug. 31, 2007, pet. denied) (mem. op.). In dividing the estate, the trial court can consider a variety of factors, and it is presumed that the trial court exercised its discretion properly. *Bell*, 513 S.W.2d at 22; *Campbell v. Campbell*, 625 S.W.2d 41, 43 (Tex. App.—Fort Worth 1981, writ dism'd).

Some of the factors the trial court may consider include the spouses' capacities and abilities, business opportunities, education, relative financial condition and obligations, size of the separate estates, and the nature of the property. *Schaban-Maurer*, 238 S.W.3d at 820–21; *Murff*, 615 S.W.2d at 699. It may also consider the wasting of community assets. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998).

5

**B. General Testimony by the Parties**

**1. Brian's Financial Status and Assets**

Brian testified that he had a bachelor's degree in business administration and had worked in various capacities, including managing inventory control and accounts payable for ten years; he had also been the chief operating officer (COO) and chief financial officer (CFO) of a small, privately-held gourmet food-and-gift company for three years before becoming CFO of TuneUp Masters in April 1998. He became TuneUp Masters's President/CEO/CFO in early 2000. During the first year of his marriage with Heather, he was also the CFO of a small chain of wedding photography studios.

Brian testified that, on August 29, 2003, he and Heather acquired TuneUp Pro, L.L.C. and that it was held only in his name. He also testified that he owned 100% of TUM Flight Services, which owned the small, four-seat airplane that he used to travel for work.

The parties testified about how Brian acquired the company from a venture capital firm "for basically all paper"—$150,000 in cash and a note for $4.6 million. Brian testified that the reason he bought TuneUp Masters was "to buy a job"—that is, to put less than one year of his salary at risk to keep his job because he felt that TuneUp Masters would operate for more than a year. By

trial, he had received over $630,000 in salary since the purchase. He also testified that, since July 2004, TuneUp Masters had not been solvent.

In December 2005, Brian sold the California and Nevada TuneUp Masters locations to Auto Life Acquisition for $2.8 million, in the form of $1.5 million in cash and $1.3 million in a sixty-day note secured by the TuneUp Masters assets in those locations. He testified that Auto Life defaulted on its $1.3 million note and that he opted to not foreclose on the note.[2] He subsequently entered into an agreement to sell the rest of the company to Auto Life because "it was the only way out." He testified that Auto Life had issued a letter of intent in June 2006 with regard to the sale, that the deal had been in the works since July 2006, and that, if the deal did not close, TuneUp Masters would likely go bankrupt. He testified that he had continued to draw a salary every month because declining to take his salary would not have saved the business.

Brian testified that, if the sale went through, he would be out of a job, and if the sale did not go through, the company would probably go bankrupt and he would still be out of a job. He also testified that, if the sale went through, "I am supposed to get one hundred thousand dollars per year for three

---

[2] He testified that to foreclose on that note would have put TuneUp Masters out of business—although it would have reclaimed the California and Nevada locations, those locations "came with a bunch of landlord liability that we wouldn't be able to fund."

years in exchange for not working in the industry and not hiring any of my current—or, anybody that's been employed by TuneUp Masters in the last twelve months." The trial court admitted the letter containing the nonsolicitation agreement. When asked about his plans after the TuneUp Masters sale, Brian testified, "Find another job. Hopefully buy another company. I'm not sure."

Donald V. Latin, Brian's valuation expert, testified that the value of TuneUp Masters as of December 31, 2005, was $0. Bryan Charles Rice, Heather's valuation expert, agreed. When asked if Heather should be upset with him "to the tune of a loss of a million three" or for taking "a company that was not in financial difficulty at the time of marriage and is now worth zero," Brian replied, "No."

Brian testified that, before marriage, he owned the house and furnishings and had a rollover IRA from a previous employer, two investment accounts, a fully-paid-for Jeep Wrangler, and a Mercedes. He testified that he sold the Jeep in 2004 for $16,000, deposited the money into his Bank of America account, and transferred it to his Mead Capital Reserve account. He testified that he paid $325,000 for the house and that it had first and second mortgages, payments to which were made during the marriage. He testified that he put the house on the market in April 2006 and that its current value was around

8

$440,000. He still owed $281,410 on the mortgage, down from $307,000 at the start of the marriage.

By the time of trial, Brian had a Chevrolet Tahoe worth around $16,430, carrying a debt of $13,259. He testified the he traded the Mercedes in on the Tahoe at a loss. He testified that he, through TuneUp Masters, bought the airplane for $78,000 in January 2004 and sold it to TUM Flight Services L.L.C. for $1.00 and that TuneUp Masters began paying a fixed fee to TUM Flight Services to maintain the plane; he was the only individual within TuneUp Masters who operated the plane. Brian bought a Harley Davidson motorcycle in May 2005 for $15,000. He neglected to include TUM Flight Services, the airplane, or the motorcycle on his initial inventory, but he testified that this was an oversight. Brian testified that $25,294 of the $34,321.64 in his 401(k) was community property.

## 2. Heather's Financial Status and Assets

Heather testified that she had been with Texas Instruments (TI) for almost fifteen years, and had been there for around ten years before she and Brian married. By trial, she was an engineering operations manager; she testified that she usually made less money than Brian.

Heather earned an executive MBA degree during marriage. Brian testified that after she got the MBA, she wanted to quit her job and do volunteer work

and that her desire to quit working lasted throughout 2003 and 2004. Heather testified that Brian told her that he would make a million dollars a year from TuneUp Masters once the note was paid off. Brian testified that he did not tell her that or tell her that she would be able to do other things. Heather testified that at the time the parties married, she had a house and a vehicle; by trial, she had her vehicle, other personal property in her possession, her TI stock options, her 401(k), and her bank accounts. Some of her TI stock options were awarded to her prior to marriage, with an estimated value of $309,945.

### 3. Community Expenses & Proposed Divisions

The parties disputed who paid most of the community expenses during the marriage and who was responsible for the most waste of community assets. Brian characterized Heather's charitable contributions in 2005 of $20,766 and in 2006 of $27,191 as waste.[3] Heather testified that she did not think that Brian managed TuneUp Masters appropriately, stating that "the biggest thing is forgiving a million-dollar debt."

Brian testified that he should be awarded 60% of the community estate because he felt that "default [sic] of the marriage was caused by [Heather's]

---

[3]Heather testified that her most important expense is her tithing a "[m]inimum of ten percent first fruits," that she had the same belief during marriage, and that Brian "allowed [her] to tithe, he just would—he asked that I limit how much"; her other major expense involved two mission trips to India.

erratic behavior, and therefore, you know, I've given up future potential for us to build a life together and the financial rewards that that encompassed." Specifically, he asked for the trial court to award him his car and its related debt, the Bank of America and Mead accounts, $45,000 from Heather's savings account, 46% of Heather's TI stock options (or $300,000 of his expert's $650,000 valuation), $175,000 from Heather's 401(k), the community economic contribution to the house, the airplane, the motorcycle, and $33,000. He testified that his separate estate was worth $229,000, and that Heather's separate estate was worth $658,000.

Heather's proposed property division exhibit showed that her separate estate was worth approximately $191,139. Accounting for the separate property TI stock options, her separate estate amounts to around $501,084. Heather stated that, if the trial court felt it necessary to move money around, she would prefer that it take the money from her 401(k) because she would "rather not have to deal with ten years of [Brian] asking [her] to exercise the stock." The exhibit containing her summary of testimony and proposal for division of the community estate was admitted without objection. Both parties requested attorney's fees; by the time of trial, Brian had spent $36,034 in attorneys' fees, and Heather's bill for attorneys' fees was around $31,625.

The trial court assigned the following property to each party:

11

- All household furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, equipment, all clothing, jewelry and other personal effects in his or her possession or subject to his or her sole control.

- All sums of cash in his or her possession or subject to his or her control, including funds on deposit together with accrued but unpaid interest, in banks, savings institutions, or other financial institutions, which accounts stand in his or her sole name, from which he or she has the sole right to withdraw funds, or from which he or she has sole control.

- The sums, whether matured or unmatured, accrued or unaccrued, vested or otherwise, together will all increases thereof, the proceeds therefrom, and any other rights related to any profitsharing plan, retirement plan, Keogh plan, pension plan, employee stock option plan, 401(k) plan, employee savings plan, accrued unpaid bonuses, disability plan, or other benefits existing by reason of his or her past, present, or future employment.

- One-half to each party of any future refund for the overpayment of taxes for any year during the parties' marriage through December 31, 2004.

The trial court awarded to Brian the 2003 Chevrolet Tahoe and the 2004 Harley Davidson motorcycle, together with all prepaid insurance, keys, and title documents. It awarded to Brian all interest in TuneUp Masters, Inc.; TUM Holdings, Inc.; Tuneup Pro, LLC; and TUM Flight Services, LLC; including but not limited to all furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, and supplies, all personal property used in connection with the operation of the business; and all rights and privileges past, present, or future, arising out of or in connection with the operation of the business. The trial court also awarded to Brian, "[a]ny and all proceeds Brian

12

may receive from the sale of the TuneUp Masters business, including specifically but not necessarily limited to the $100,000 per year he may receive for three (3) years for not soliciting any of the current employees.

The trial court confirmed the following as Brian's separate property: the marital residence, including any economic contribution that the community estate was entitled to; and all sums in the Mead Credit Union accounts (less $10,830 to Heather), the Linsco IRA rollover account, the Linsco brokerage account, and the Putnam account, including any community interest that Heather might have therein.[4]

The trial court awarded to Heather the sum of $10,830 payable from Brian's Homeland Capital Reserve account, formerly Mead Capital account, to represent the remaining proceeds in that account arising from the sale of Heather's separate property residence, and all Texas Instruments stock options granted to her during the marriage, the value of which Heather estimated to be $241,748 and Brian estimated to be $652,759. The trial court also confirmed Heather's BMW as her separate property.

---

[4]When separate property produces income and that income is acquired by a spouse, it is community property. *Lipsey v. Lipsey*, 983 S.W.2d 345, 350 (Tex. App.—Fort Worth 1998, no pet.).

## C. The "Non-solicitation Contract" and Fault Grounds

In his first point, Brian contends that the trial court abused its discretion by assessing a value of $300,000 to the "non-solicitation contract" contained in a legally unenforceable letter of intent, which he claims was further mischaracterized by the trial court as a sales contract and resulted in a manifestly unfair division of the community estate.  In this same point, Brian also complains that "the great weight and preponderance of the evidence showed that the fault of the break up of the marriage was with Heather," claiming that a division of the community estate in Heather's favor was not supported by the evidence and that a division in his favor was.

### 1. The Nonsolicitation Contract

An executed copy of the "non-binding letter" outlining Auto Life's intention to purchase TuneUp Masters, admitted into evidence by the trial court, states,

4.    Non-Solicitation Agreement.

As a condition to the closing of the Transaction, Brian Hendershot shall enter into a three (3) year non-solicitation agreement whereby [he] shall not, directly or indirectly, engage, employ or solicit the employment of any person who is then or has been within twelve (12) months prior to the time of such action, an employee of [TuneUp Masters].  Brian Hendershot shall receive compensation over the three years of the non-solicitation period at $100,000 per year, paid monthly pro-rata.

The letter also includes the following: "This Letter of Intent shall terminate ten (10) days following the receipt by a party of a written notice of termination from the other party, or August 29, 2006, whichever occurs first." The parties' trial was held from February 28, 2007, to March 1, 2007.

During trial, Brian testified that he "absolutely" had concerns about whether or not he would actually receive anything from Auto Life after the sale, since it had defaulted on the note. To that end, he testified that he had asked for half of the noncompete payment to be escrowed when the sale closed and that he was going "to ask for it to be paid on every other month, half from them and half from the escrow." He testified that a purchase agreement that was still being negotiated would come after the letter of intent and that, by trial, Auto Life still had to finish working up their financials to get the loan to buy TuneUp Masters, but that they were in the closing process. He added, "Well, I'm hopeful we'll close."

During closing arguments, Brian's attorney presented the issue of whether Brian would actually receive the $300,000 firmly before the trial court, stating:

> Is there a question about whether or not he will get that money [$300,000] in the future? Absolutely. You heard his testimony. He's trying to negotiate to get half of it escrowed because he doesn't trust the people. The best evidence of whether or not to trust those people about honoring their obligations is how they defaulted on a one-point-three-million-dollar note last year. That's why the current sale is an all-cash deal. . . . And I think that giving

15

her 91 percent of the community estate, which is the way it looks to us, would be grossly unfair. We believe the Court, in looking at the totality of the circumstances, Your Honor, will come to the conclusion that the community estate should be divided disproportionately in favor of Brian Hendershot.

Neither party pointed out to the trial court that the letter, by its own terms, had expired; however, because it was admitted into evidence, the trial court had the letter before it when it made its property division.

## 2. Fault

The parties' testimonies differed with regard to Brian's fault grounds: a vasectomy he claimed Heather insisted upon, her subsequent tubal ligation, "her ranting and raving and threatening to kill" him, and her unauthorized writing of a check on his account.

Specifically, the trial court heard testimony both that Heather forced Brian to have a vasectomy and that the parties discussed the vasectomy and agreed to it for the benefit of Heather's health. Brian testified that Heather forged his name on a $1,000 check to contribute to a family purchase of a car for her mother, but Heather testified that Brian gave her permission to write that check on his account; Brian also testified that Heather threatened physical harm to him one night in 2004; Heather testified that she did not recall the incident and did not believe that it happened and that Brian was lying. She testified that

Brian never brought up concerns about the vasectomy, the $1,000 check, or her alleged abusive or violent behavior in marriage counseling.

### 3. Analysis

The trial court had sufficient evidence upon which to exercise its discretion and could have reasonably concluded that Heather was not at fault for the marriage's break up. And because an abuse of discretion does not occur when the trial court bases its decision on conflicting evidence, as here, we cannot conclude that the trial court abused its discretion by disregarding Brian's alleged fault grounds. *See Barber*, 982 S.W.2d at 366. We overrule this portion of Brian's first point.

Based on the parties' testimonies, the trial court was entitled to conclude that the parties' capacities, abilities, and education were similar and to divide the community estate accordingly.[5] *See Schlueter*, 975 S.W.2d at 588; *Murff*,

---

[5]The trial court noted this in a letter to the parties' attorneys on March 12, 2007, a letter "intended to be the equivalent of a docket entry," and not a final order, in which it stated,

> [T]his marriage is a relatively short term marriage between two very competent, capable, and hard working people. There is little doubt in my mind that both . . . have been very successful and will remain successful throughout their careers. Each party has pursued [his or her] career path[], has saved, and/or has spent money according to how each has seen fit. . . . It simply appears to me that each party should reap the benefits of his or her labors.

17

615 S.W.2d at 699; *Schaban-Maurer*, 238 S.W.3d at 820–21. Brian testified that he intended to possibly buy another business, and the trial court could have considered, based on Brian's testimony, that his relative financial condition, particularly with regard to the size of his separate property estate, even excluding the $300,000 nonsolicitation agreement, did not require a disproportionate allocation of community property in his favor. *Murff*, 615 S.W.2d at 699; *Schaban-Maurer*, 238 S.W.3d at 820–21.

Furthermore, the trial court could consider testimony about the waste of community assets. *Schlueter*, 975 S.W.2d at 588–89. The trial court issued temporary orders on June 15, 2005, enjoining the parties from "[d]estroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties." Brian characterized Heather's charitable contributions totaling $47,957 as waste, but during the same time period, Brian acquired the motorcycle for $15,000 and waived Auto Life's $1.3 million default on its note to TuneUp Masters. Therefore, the trial court could have concluded that any waste of community assets by Heather was cancelled out or exceeded by Brian's own waste and that it should be counted against him in the property division.

The trial court heard testimony about the potential for the $300,000 nonsolicitation agreement to fall through and heard closing argument that

specifically pointed this out. The trial court's order stated that Brian's property included "[a]ny and all proceeds [Brian] *may* receive from the sale of the TuneUp Masters business[,] including specifically but not necessarily limited to the $100,000 per year he *may* receive for three (3) years for not soliciting any of the current employees." [Emphasis added.] Although Brian complains that the trial court misconstrued the letter of intent in its letter of rendition as a legally enforceable right, the trial court specifically stated, with regard to the $300,000, that it considered it community property "*if received* according to the proposed contract," meaning the proposed sales contract that was supposed to follow the letter of intent, and which Brian testified was still under negotiation.

Furthermore, the trial court pointed out during the hearing on Brian's motion for new trial:

> I recall the testimony that it was certainly not a surety that [the $300,000] was going to come in, and, in fact, [Brian] . . . was very clear, and I think [Brian's attorney] made it very clear, that it was certainly more than a possibility it might not come in. . . . And, in fact, in my rendition, I did state "if received."
>
> . . . . I considered all the evidence about TuneUp Masters, about this three-hundred-thousand-dollar possible agreement not to solicit the employees. . . . The problem at the time was two of the major assets of . . . these parties, was one, the TuneUp Masters and the possible three-hundred-thousand-dollar agreement, and the other was the stock options.

19

Again, it seems to me like it could have gone exactly the other way. This agreement may have come in. [Brian's] ship may have come in and he had three hundred thousand dollars in his pocket. Her stock options could have gone totally down the drain and she would have nothing.

The trial court clearly considered the $300,000 nonsolicitation agreement as nothing more than a potential benefit when it awarded it to Brian.

Brian's own calculations presented to the trial court that he was responsible for 8.88% of the community estate and that Heather was responsible for 91.12%; he proposed a division awarding to him 60% based only on her "erratic behavior" and on no other theory. Because we must presume that the trial court exercised its discretion properly, and because the trial court had the discretion to consider all of the above factors and more in its division of the community estate, we hold that the trial court did not abuse its discretion by choosing to believe Heather's testimony over Brian's with regard to fault, and by accounting for and including the $300,000 nonsolicitation agreement that, at the time of trial, Brian might have received, in its overall division of the community estate. *See Bell*, 513 S.W.2d at 22. We overrule the remainder of Brian's first point.

**D. Stock Options and Heather's 401(k)**

In his second point, Brian complains that the trial court erred by not dividing Heather's stock options in kind, claiming that valuation testimony

showed a huge potential fluctuation in values. In his fourth point, he argues that the trial court erred by awarding to Heather all of her 401(k) savings plan and all of her savings account. He asserts that both errors "resulted in a grossly unfair division of the community estate."

Texas courts have consistently held that stock options acquired during marriage are a contingent property interest and a community asset subject to division upon divorce. *Boyd*, 67 S.W.3d at 410; *Kline v. Kline*, 17 S.W.3d 445, 446–47 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). The family code sets out that, in a divorce decree, the trial court shall determine the rights of both spouses to stock options or other employer plans "in the nature of compensation or savings." Tex. Fam. Code Ann. § 7.003; *see also id.* § 3.007(d) (Vernon 2006) (describing the formula for the division of stock options between community and separate estates).[6] However, there is nothing in the code or case law with regard to the proper method of stock option valuation. *Cf. Boyd*, 67 S.W.3d at 411. The trial court has the discretion to award retirement benefits earned during marriage to the party who earned them. *Schaban-Maurer*, 238 S.W.3d at 820–21. Funds in a savings account

---

[6]Brian states that testimony concerning what portion of the options granted were community and which were separate was uncontested.

21

that were earned during marriage are community property, subject to the trial court's just and right division. *See* Tex. Fam. Code Ann. §§ 3.002, 7.001.

### 1. Stock Options

With regard to the value of Heather's TI stock options, the parties stipulated that the value of TI stock the day before trial was $30.67 a share, and their experts presented dueling valuation methodologies. Heather's expert, Rice, testified that he used the intrinsic value method, which involves "taking the fair market value of the stock that is represented by the option, and then . . . subtract[ing] from that the strike price [the price at which the option can be exercised]," and that the intrinsic value is calculated from the differential multiplied by the number of options that are available. He testified that the Black Scholes option pricing method recommended by Brian's expert was typically used to value European-style stock options, which can only be exercised on their expiration date, and to value publicly-traded options, and that Heather's TI options were American-style options, which can be exercised at any time after the vesting date and prior to the expiration date, that they were not publicly traded, and that they were non-transferable. He also described the Black Scholes model as requiring assumptions about volatility for a hypothetical exercise date, calling it "a subjective determination" with regard to the stock's

22

volatility. He testified that the intrinsic value method eliminates a lot of the uncertainties presented by the Black Scholes model.

Rice testified that, using the intrinsic value method, the community value of the options that were available was $219,975, before income tax. He testified that some of the options had strike prices in excess of the current stock market value so that it would be pointless to exercise the option, and he valued those options at $0.

Brian's expert, Latin, testified that Heather's stock options should be valued using the Black Scholes model. He testified that in valuing stock options, "[p]eople are willing to buy options that are . . . under water, the exercise price is above the market price, they will pay something for that because, during the term of the warrant, they have an opportunity to exercise" and "[t]he more volatile the stock is, the more valuable the option is." He testified that the Black Scholes method was better, "because it shows what a theoretical value of an option is, rather than just looking at it today."

Latin testified that, assuming a price of $30 a share, based on the Black Scholes method, the community value of Heather's stock options was $585,174, and assuming a price of $32.21, the community value would be $652,759—the amount Brian listed in his proposed division of the parties' assets. He testified that Heather's options were not transferable but that the

23

Black-Scholes methodology would still apply even if no one else could buy her options. Heather testified that she would have to stay employed with TI to keep her options.

## 2. Heather's 401(k) and Savings Account

Heather testified that, as of trial, her 401(k) contained $352,436, of which $199,057 was community property and $153,379 was her separate property.[7] Heather also testified that she did not have substantial savings in her savings account until February 2005, when she received her bonus from TI, which increased her account by $50,000. She also testified that the bonus was not guaranteed, but was based on both her performance and the company's performance.

## 3. Analysis

Brian asserts that, "[i]n dealing with such sharply differing testimony concerning the value of the options, the prudent thing for the [t]rial [c]ourt to do [was] to divide the options between the parties" and that it was an abuse of discretion not to do so. However, the trial court had the option to believe either Rice or Latin with regard to the value of the stock options, and then to

---

[7]Brian testified that only $147,980 of Heather's 401(k) was her separate property because after they married, the value of the fund dropped from $153,379.

divide or not divide the stock options accordingly. Assuming that the trial court favored Rice's valuation and taking into consideration the evidence at trial on the other factors that the trial court had the discretion to consider in dividing the community estate, previously addressed above, we cannot say that its allocation of all of the stock options to Heather was so arbitrary and unreasonable as to amount to a clear abuse of discretion. *See Downer*, 701 S.W.2d at 241–42; *Boyd*, 131 S.W.3d at 610.

Furthermore, with regard to the trial court's allocation to Heather of her entire 401(k) and her savings account, based on the testimony at trial, the parties' proposed division of assets, and the factors that the trial court could consider in reaching an equitable division, we cannot say that the trial court's allocation here was unreasonable or arbitrary either. *See Schaban-Maurer*, 238 S.W.3d at 820–21. Therefore, we overrule Brian's second and fourth points.

### E. Heather's Separate Property

In his third point, Brian argues that the trial court erred by awarding to Heather $10,830 in the Homeland Capital Reserve Account (formerly the Mead account) as her separate property, without any evidence of tracing from Heather and "despite clear testimony that any of her separate property in the account had been withdrawn."

We note first that the trial court's final divorce decree stated that the $10,830 from the Mead account "*represent[ed]* the remaining proceeds" of the sale of Heather's separate property residence, and not that they *were* the actual separate property proceeds. [Emphasis added.] Furthermore, our courts have found no difficulty in following separate funds through bank accounts. *See Welder v. Welder*, 794 S.W.2d 420, 425 (Tex. App.—Corpus Christi 1990, no writ); *Sibley v. Sibley*, 286 S.W.2d 657, 659 (Tex. Civ. App.—Dallas 1955, writ dism'd). A showing that community and separate funds were deposited in the same account does not divest the separate funds of their identity and establish the entire amount as community when the separate funds may be traced and the trial court is able to determine accurately the interest of each party. *Welder*, 794 S.W.2d at 425; *Holloway v. Holloway*, 671 S.W.2d 51, 60 (Tex. App.—Dallas 1983, writ dism'd). One dollar has the same value as another, and under the law there can be no commingling by the mixing of dollars when the number owned by each claimant is known. *Welder*, 794 S.W.2d at 425; *Trawick v. Trawick*, 671 S.W.2d 105, 110 (Tex. App.—El Paso 1984, no writ).

When separate funds can be traced through a joint account to specific property purchased with those funds, without surmise or speculation about funds withdrawn from the account in the interim, then the property purchased

26

is also separate. *See McKinley v. McKinley*, 496 S.W.2d 540, 543–44 (Tex. 1973). Where a bank account contains both community and separate funds, we presume that the community funds are drawn out first, before separate funds are withdrawn, and where there are sufficient funds at all times to cover the separate property balance in the account at the time of divorce, we presume that the balance remains separate property; this is known as the "community-out-first" presumption. *See Welder*, 794 S.W.2d at 433.

In the trial court's temporary order issued in June 2005, the trial court found that the parties stipulated that $27,831 "from the joint account" was Heather's separate property, and the trial court ordered Brian to pay it to her.[8] Brian testified that he deposited $38,661, the proceeds from the sale of Heather's separate property house, into the Mead account in 2002. The proceeds from the sale of Heather's separate property house less $27,831 would amount to $10,830; the trial court's June 2005 order does not address this amount. Rather, it states, "IT IS FURTHER ORDERED that the balance of the account is still to be determined as to its character."

---

[8]The parties testified that they had no joint accounts, however, it becomes clear from the record that the trial court's order referred to Brian's Mead Capital Reserve account into which Brian deposited both community funds and separate funds from both parties.

At trial, Brian admitted that he agreed to give to Heather $27,831 out of his Mead Capital account. He testified that, since the temporary order, he had reviewed the account and that he did not believe that the money was Heather's separate property. Heather's attorney objected, and Brian's attorney responded by acknowledging that the order stipulated that "that money," apparently meaning the $27,831, would be paid to her and that it was Heather's separate property, although "the facts don't support it."

At trial, Brian disputed that the funds remaining in the account had any portion that was Heather's separate property. Brian testified that, in 2003, the Mead Reserve account dipped below $38,661 to $3,027 when the parties withdrew $125,000 from the account to purchase TuneUp Masters and when he transferred $9,000 into his operating account. Brian first testified that the $9,000 was used for the parties' living expenses, but then admitted that $8,000 of those funds were then moved into TuneUp Pro, L.L.C. Heather's attorney asked Brian, "You elected to withdraw the monies. Had you left those, there would be sufficient funds to cover Heather's balance of separate funds; isn't that true?" Brian replied, "I guess," but reiterated that $16,000 of the funds now remaining in the account were his separate property from the subsequent sale of his separate property jeep.

28

The Mead Reserve account statement, entered into evidence by both parties, illustrates that the account was opened during marriage, on February 13, 2002. There was no tracing at trial with regard to the amounts deposited into the Mead Reserve account, $1,750, before Brian deposited Heather's $38,661 on February 26, 2002. The account did not dip below $40,411 until Brian withdrew $125,000 on August 22, 2003. The account, which previously held $135,387.80, dropped to $10,387.80. After Brian made several deposits, it dropped to $3,027.46 when he transferred out $9,000, but it never dropped below $3,027.46. Applying the principles of tracing and the presumption that community property is removed first, the remaining $3,027.46 was Heather's separate property.

Brian testified that of the $20,204.22 remaining in the account, $16,000 was his separate property proceeds from the sale of his jeep. Subtracting $16,000 from $20,204.22, $4,204.22 remained in the account. From that $4,204.22, $3,027.46 was Heather's separate property. Because there was no testimony at trial with regard to the characterization of the remaining $1,176.76 in the account, these funds are presumed community, and the trial court had the discretion to allocate them to Heather; therefore, the trial court had the discretion to allocate to Heather only $4,204.22, and not $10,830, from Brian's Mead Reserve Account.

29

The difference, $6,625.78, is de minimis within the context of the entire community estate and both parties' separate estates and when compared to the amount of each parties' attorney's fees in this matter. And because Brian neither argues nor even raises the issue that the trial court divested him of his separate property when it awarded the extra $6,625.78 to Heather, we are constrained to conclude that the trial court did not abuse its discretion.[9] We overrule Brian's third point.

## IV. Conclusion

Having overruled all of Brian's points, we affirm the trial court's judgment.



BOB MCCOY
JUSTICE

PANEL: LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DELIVERED: October 2, 2008

---

[9]An appellate court cannot reverse a trial court's judgment absent properly assigned error. *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998); *Dawson v. Briggs*, 107 S.W.3d 739, 744 (Tex. App.—Fort Worth 2003, no pet.).